01

02

03

04

05

06                          UNITED STATES DISTRICT COURT
                         FOR THE EASTERN DISTRICT OF CALIFORNIA
07

08  DARRYL A. SCHLAPPI,                    )
                                           )
09           Petitioner,                   )    CASE NO. 2:10-cv-00113-RSL-JLW
                                           )
10      v.                                 )
                                           )
11  STEVEN MOORE, Warden,                  )    REPORT AND RECOMMENDATION
                                           )
12           Respondent.                   )
    _____    )
13

14       I.      INTRODUCTION

15            Petitioner Darryl Schlappi is currently incarcerated at the Deuel Vocational Institution

16  in Tracy, California.  In 1990, he was convicted by a jury in the San Diego County Superior

17  Court of one count of attempted first degree murder with a firearm enhancement, and

18  sentenced to a term of life with the possibility of parole, plus two years.  (*See* Docket 1 at 1.)

19  Having exhausted his remedies in the courts of California, petitioner seeks federal habeas

20  corpus relief under 28 U.S.C. § 2254.  Specifically, he challenges his 2007 denial of parole by

21  the Board of Parole Hearings of the State of California (the "Board").[1]  (*See id.*, Ex. A at 1.)

22  _____

            [1] The Board of Parole Hearings replaced the Board of Prison Terms, which was abolished on July 1,
    2005.  *See* California Penal Code § 5075(a).

    REPORT AND RECOMMENDATION - 1

01          Respondent has filed an answer to the petition in which he admits petitioner has

02   exhausted the claims set forth in his federal habeas petition, but contends petitioner's claims

03   are without merit.  (*See* Dkt. 12 at 4-12.)  Petitioner has filed a traverse in response to

04   respondent's answer.  (*See* Dkt. 13.)  The briefing is now complete, and this matter is ripe for

05   review.

06          Having thoroughly reviewed the record and briefing of the parties, I recommend that

07   the Court find as follows:

08          (1)   The U.S. Supreme Court has clearly held that where a state statutory scheme
                  includes mandatory language that creates a presumption of parole release
09                based on certain designated findings, that statute gives rise to a federal
                  constitutional liberty interest in parole;

10

11          (2)   California statutes and regulations contain such mandatory language;

12          (3)   That language provides that a prisoner serving an indeterminate life sentence
                  has an expectation of parole release unless the Board or the Governor finds that
                  he will pose an unreasonable risk of danger to society if released on parole;

13

14          (4)   The California Supreme Court has interpreted this statutory language to
                  provide that an adverse parole decision must be supported by "some evidence"
                  of current dangerousness;

15

16          (5)   Whether "some evidence" of current dangerousness exists is determined in
                  accordance with California law;

17          (6)   Applying these standards, the record before the Board in 2007 contained
                  "some evidence" of petitioner's dangerousness;

18

19          (7)   The denial of parole therefore did not violate petitioner's federal due process
                  rights, and the decision of the California Court of Appeal upholding the denial
                  was a reasonable application of clearly established federal law;

20

21          (8)   Petitioner's claim that his due process rights were violated because he did not
                  receive a "fair and impartial" parole hearing should be denied; and

22

REPORT AND RECOMMENDATION - 2

01    (9)    The Court should deny the petition for a writ of habeas corpus and dismiss
             this action with prejudice.

02    II.    FACTUAL BACKGROUND

03           During the 2007 parole hearing, the Board referred to the following summary of the

04    commitment offense, as set forth by petitioner's life prisoner evaluation reports:[2]

05                 On September 8, 1988, Police were called in to investigate a
06                 possible gunshot victim in a remote area adjacent to the San
                   Luis Rey River. Upon Police arrival, the victim was still alive.
07                 Life Flight transported him to the hospital where the victim
                   (William Odom, Jr.) expired due to multiple gunshot wounds.
08                 Because of the severity of his wounds, he was unable to tell
                   police anything about his assailants.

09                 During the Police investigation, information was received
10                 implicating three men in the killing. The three men were known
                   on the streets as "German, Psycho, and Cowboy." The
11                 investigation continued without any concrete evidence or
                   arrests.  On January 6, 1990, Glen Sinaiko, a.k.a. "Psycho,"
12                 voluntarily came to Oceanside Police Department and confessed
                   to having been involved in the shooting.  He told the police that
13                 defendant, Darryl Schlappi, a.k.a. "German," shot the victim in
                   the head.  Sinaiko stated the motive for the murder was a $60
14                 drug debt.  Sinaiko testified that he, Schlappi, and Randy Gray,
                   a.k.a. "Cowboy," met the victim in a restaurant in Oceanside.
15                 They were able to lure him into the vehicle and drive him to the
                   riverbed, where the victim and Sinaiko got out of the car and
16                 walked into an adjacent bush area. Sinaiko gave the victim a
                   line of cocaine to waste time, while he waited for Schlappi to
17                 show up with the shotgun.  Sinaiko took the weapon and shot
                   the victim in the lower abdomen, handed the shotgun to
18                 Schlappi and ran toward the car.  He returned to the location
                   and witnessed Schlappi shoot the victim in the region of the
19                 head.  After this event, both men returned to the car and Gray
                   drove them back to Oceanside.

20                 On February 2, 1990, Schlappi was arrested in Utah by the
21                 Oceanside Police Department.  During Police interviews,

22    _____
              [2] Although the Board asserted that it was utilizing petitioner's November 2006 evaluation as the
      relevant "Statement of Facts," the summary the Board actually read into the record appears to come from
      petitioner's July 2005 evaluation.  (*See* Dkt. 1, Ex. A at 8-9; *id.*, Exs. C and I.)

01                 Schlappi denied any involvement. He later recanted and admitted that he was there, but denied shooting the victim.

02 (Dkt. 1, Ex. I at 1.)

03        The Board also read petitioner's version of the crime into the record:

04

05                 In the past Schlappi had denied shooting the victim.  However, at the time of his Initial Parole Consideration Hearing in April of 1997, he stated that he was at the scene, and that he did in fact shoot the victim in the leg, but not the neck.  Schlappi stated that Sinaiko shot the victim in his neck and stomach, and that the victim died as a result of the stomach wound.  Schlappi further stated that he knew what he did was wrong, that he takes full responsibility for his part in the crime, and that he would have to live with that guilt for the rest of his life.  Schlappi stated that he has admitted at his last two BPT hearings that he took the victim's wallet, wiped the shotgun clean, and agrees with the police report that the shotgun was returned to the owner.  Schlappi stated there was a dispute between Sinaiko and the victim over a $60.00 drug debt and that they were only going to scare and intimidate him in order to make him pay Sinaiko.  Schlappi stated he had no idea Sinaiko intended on killing the victim.

06

07

08

09

10

11

12

13 (*Id*. at 1-2; *id*., Ex. A at 23-24.)

14        In addition, during petitioner's 2007 parole hearing, petitioner told the Board that the

15 victim was lying in a curled up fetal position on the ground when petitioner shot him.  (*See*

16 *id*., Ex. A at 23 and 28.)  Specifically, petitioner asserted that "[t]he shot that I had fired was

17 from behind, which grazed his neck and hit his legs, my one shot.  That's how you get the two

18 wounds . . . but it seems like there's been some confusion on that."  (*Id*. at 24.)

19        Petitioner was convicted by a jury of one count of attempted first degree murder with

20 use of a firearm in 1990, and sentenced in the San Diego County Superior Court to a term of

21 life with the possibility of parole, plus two years.  (*See id*. at 1.)  Petitioner was received into

22 the California Department of Corrections on February 26, 1991, and his minimum eligible

01  parole date was set for June 21, 1998.  (*See id*.)  Thus, petitioner had been in custody for

02  approximately sixteen years at the time of his 2007 parole hearing, and approximately

03  nineteen years as of this writing.  He has been incarcerated for more than twelve years past his

04  minimum eligible parole date.

05      The parole denial, which is the subject of this petition, followed a parole hearing held

06  on November 8, 2007.  (*See id.*)  This was petitioner's eighth parole application, including his

07  initial parole consideration hearing.  His previous applications were also denied.[3]  After his

08  2007 denial, petitioner filed habeas corpus petitions in the San Diego County Superior Court,

09  California Court of Appeal, and California Supreme Court.  (*See* Dkt. 12, Exs. 2, 5, and 7.)

10  Those petitions were unsuccessful.  This federal habeas petition followed.  Petitioner contends

11  his 2007 parole denial violated his federal rights under the Due Process Clause of the U.S.

12  Constitution.  (*See* Dkt. 1 at 6.)  Thus, the habeas petition before this Court does not attack the

13  propriety of his conviction or sentence, but solely challenges the Board's 2007 decision

14  finding him unsuitable for parole.

15      III.    PARTIES' CONTENTIONS

16      Petitioner contends that the Board violated his state and federal due process rights by

17  finding him unsuitable for parole based primarily upon the immutable facts of the

18  commitment offense and his prior criminal history.[4]  (*See* Dkt. 1 at 4.)  He also argues that the

19

20      [3] Since his 2007 parole denial by the Board, petitioner has had one subsequent parole hearing in 2008. His federal habeas petition challenging that decision is currently pending before the Honorable Kimberly J. Mueller.  (*See* Case No. 2:10-cv-000486-GEB-KJM.)  A prior habeas petition, challenging the Board's 2006

21  denial, is also currently pending before the Honorable Craig M. Kellison.  (*See* Case No. 2:08-cv-01707-MCE-CMK.)

22      [4] Petitioner's state law claims are not cognizable in a federal habeas petition.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (asserting that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

01   panel's criticism of his parole plans was "unreasonable" because petitioner "has no family in

02   California," and therefore "[i]t is unreasonable to expect [petitioner] to know all of these

03   people or organizations personally." (*Id*. at 5.)  As a result, he asserts that there is no evidence

04   to support the Board's conclusion that petitioner currently poses an unreasonable risk of

05   danger to society.  (*See id*.)  Finally, petitioner argues that the Board denied him a fair and

06   impartial hearing under the Due Process Clause by asking him during his hearing about a

07   witness' statement to police regarding petitioner's role in the commitment offense.  (*See id*. at

08   6-8.)

09            Respondent contends that petitioner does not have a constitutionally protected liberty

10   interest in being released on parole, that the "some evidence" standard is inapplicable in this

11   context, and that even if he does have a protected liberty interest, the Board adequately

12   predicated its denial of parole on "some evidence."  (*See* Dkt. 12 at 8-11.)  Respondent also

13   contends that petitioner's claim regarding the witness' statement introduced during his parole

14   hearing is based upon state rather than federal law, and is therefore not cognizable on federal

15   habeas review.  (*See id*. at 5.)  In sum, respondent argues that petitioner's federal

16   constitutional rights were not violated by the Board's 2007 decision, and that the California

17   Court of Appeal's decision upholding the Board's 2007 parole denial was not an unreasonable

18   application of clearly established federal law.  (*See id*. at 11-12.)

19            IV.      STANDARD OF REVIEW AND REQUIRED SHOWINGS

20            The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this

21   petition because it was filed after the enactment of AEDPA.  *See Lindh v. Murphy*, 521 U.S.

22   320, 326-27 (1997).  Because petitioner is in custody of the California Department of

01  Corrections pursuant to a state court judgment, 28 U.S.C. § 2254 provides the exclusive

02  vehicle for his habeas petition.  *See White v. Lambert*, 370 F.3d 1002, 1009-10 (9th Cir. 2004)

03  (providing that § 2254 is "the exclusive vehicle for a habeas petition by a state prisoner in

04  custody pursuant to a state court judgment, even when the petitioner is not challenging his

05  underlying state court conviction.").  Under AEDPA, a habeas petition may not be granted

06  with respect to any claim adjudicated on the merits in state court unless petitioner

07  demonstrates that the highest state court decision rejecting his petition was either "contrary to,

08  or involved an unreasonable application of, clearly established Federal law, as determined by

09  the Supreme Court of the United States," or "was based on an unreasonable determination of

10  the facts in light of the evidence presented. . . ."  28 U.S.C. § 2254(d)(1) and (2).

11      As a threshold matter, this Court must ascertain whether relevant federal law was

12  "clearly established" at the time of the state court's decision.  To make this determination, the

13  Court may only consider the holdings, as opposed to dicta, of the U.S. Supreme Court.  *See*

14  *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  In this context, Ninth Circuit precedent

15  remains persuasive but not binding authority.  *See id.* at 412-13; *Clark v. Murphy*, 331 F.3d

16  1062, 1069 (9th Cir. 2003).

17      The Court must then determine whether the state court's decision was "contrary to, or

18  involved an unreasonable application of, clearly established Federal law."  *Lockyer v.*

19  *Andrade*, 538 U.S. 63, 71 (2003).  "Under the 'contrary to' clause, a federal habeas court may

20  grant the writ if the state court arrives at a conclusion opposite to that reached by [the

21  Supreme] Court on a question of law or if the state court decides a case differently than [the]

22  Court has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 412-13.

01  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the

02  state court identifies the correct governing legal principle from [the] Court's decisions but

03  unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  At all

04  times, a federal habeas court must keep in mind that it "may not issue the writ simply because

05  [it] concludes in its independent judgment that the relevant state-court decision applied clearly

06  established federal law erroneously or incorrectly.  Rather that application must also be

07  [objectively] unreasonable." *Id.* at 411.  It is the petitioner's burden to establish that the state

08  court decision was contrary to, or involved an unreasonable application of, clearly established

09  federal law.  *See* 28 U.S.C. § 2254; *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

10       AEDPA also requires federal courts to give considerable deference to state court

11  decisions, and state courts' factual findings are presumed correct.  *See* 28 U.S.C. § 2254(e)(1).

12  Federal courts are bound by a state's interpretation of its own laws.  *See Murtishaw v.*

13  *Woodford*, 255 F.3d 926, 964 (9th Cir. 2001) (citing *Powell v. Ducharme*, 998 F.2d 710, 713

14  (9th Cir. 1993)).  This deference, however, is accorded only to "reasoned decisions" by the

15  state courts.  To determine whether the petitioner has met this burden, a federal habeas court

16  looks to the last reasoned state court decision because subsequent unexplained orders

17  upholding that judgment are presumed to rest upon the same ground.  *See Ylst v. Nunnemaker*,

18  501 U.S. 797, 803-04 (1991); *Medley v. Runnels*, 506 F.3d 857, 862 (9th Cir. 2007).

19       In this case, after the San Diego County Superior Court denied petitioner's habeas

20  petition on the merits, petitioner filed petitions in the California Court of Appeal and Supreme

21  Court.  (*See* Dkt. 12, Exs. 2, 5, and 7.)  The California Court of Appeal denied the habeas

22  petition in an unpublished opinion filed on July 20, 2009.  (*See id.*, Ex. 5.)  Petitioner's habeas

01  petition in the California Supreme Court was summarily denied.  (*See id*., Ex. 7.)  This Court

02  should therefore regard the California Court of Appeal's opinion as the last reasoned decision

03  of the state courts and should accord that decision the deference required by AEDPA.

04            V.      FEDERAL HABEAS CHALLENGES TO STATE PAROLE DENIALS

05            A.    *Due Process Right Under California's Parole Scheme*

06          Under the Fifth and Fourteenth Amendments to the U.S. Constitution, the federal and

07  state governments are prohibited from depriving an inmate of life, liberty or property without

08  the due process of law.  U.S. Const. amends. V and XIV.  A prisoner's due process claim

09  must be analyzed in two steps: the first asks whether the state has interfered with a

10  constitutionally protected liberty or property interest of the prisoner, and the second asks

11  whether the procedures accompanying that interference were constitutionally sufficient.  *Ky.*

12  *Dep't of Corrections. v. Thompson*, 490 U.S. 454, 460 (1989).

13          Accordingly, our first inquiry is whether petitioner has a constitutionally protected

14  liberty interest in parole.  The U.S. Supreme Court articulated the governing rule in this area

15  in *Greenholtz v. Inmates of Neb. Penal*, 442 U.S. 1 (1979), and *Board of Pardons v. Allen*,

16  482 U.S. 369 (1987).  *See McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002) (applying

17  "the 'clearly established' framework of *Greenholtz* and *Allen*" to California's parole scheme).

18  The Court in *Greenholtz* determined that although there is no constitutional right to be

19  conditionally released on parole, if a state's statutory scheme employs mandatory language

20  that creates a presumption that parole release will be granted if certain designated findings are

21  made, the statute gives rise to a constitutional liberty interest.  *See Greenholtz*, 442 U.S. at 7,

22  12; *Allen*, 482 U.S. at 377-78.  *See also Vitek v. Jones*, 445 U.S. 480, 488 (1980) ("We have

01  repeatedly held that state statutes may create liberty interests that are entitled to the procedural

02  protections of the Due Process Clause of the Fourteenth Amendment.").

03       As discussed *infra*, the California statutes and regulations at issue in this case contain

04  mandatory language providing that a prisoner serving an indeterminate life sentence has an

05  expectation of parole unless, in the judgment of the parole authority, he "will pose an

06  unreasonable risk of danger to society if released from prison."  15 CCR § 2402(a).

07  Specifically, California Penal Code § 3041(b) provides that the Board "*shall* set a release date

08  unless it determines . . . that consideration of the public safety requires a more lengthy period

09  of incarceration for this individual. . . ."  Cal. Penal Code § 3041(b) (emphasis added).  The

10  California Supreme Court has interpreted this language to provide that an adverse parole

11  decision must be supported by "some evidence" demonstrating current dangerousness.  *See In*

12  *re Lawrence*, 44 Cal.4th 1181, 1204 (2008); *In re Shaputis*, 44 Cal.4th 1241, 1254 (2008).

13  Thus, the California Supreme Court has held that as a matter of state constitutional law, this

14  mandatory language in California's parole scheme creates a liberty interest in parole.  *See*

15  *Lawrence*, 44 Cal.4th at 1204; *Shaputis*, 44 Cal.4th at 1254, 1258; *In re Rozenkrantz*, 29

16  Cal.4th 616, 654 (2002).

17       In addition, the Ninth Circuit recently considered this statutory language in *Hayward*

18  *v. Marshall*, and concluded that the appropriate inquiry for a federal habeas court is whether

19  "some evidence" of current dangerousness supported the Board or Governor's denial of

20  parole.  603 F.3d 546, 562 (9th Cir. 2010).  In other words, the federal Due Process Clause

21  requires that California comply with its own quantum of evidence requirement.  *See id*. at 569

22  (Berzon, J., concurring in part and dissenting in part) (asserting that "the majority is correct to

01   review the state court decision here for compliance with the California Constitution's

02   requirement of 'some evidence' of future dangerousness.  The federal Due Process Clause

03   requires at least that much.").  Accordingly, the majority in *Hayward* observed that it did not

04   need to decide "whether a right arises in California under the United States Constitution to

05   parole in the absence of some evidence of future dangerousness."  *Id.*  The *Hayward* court

06   could finesse this ultimate legal issue because it found, as I recommend this Court find in this

07   case, as a matter of fact, that the record contained "some evidence" of petitioner's

08   dangerousness.

09          Critical to our analysis and what the majority failed to articulate, however, is the fact

10   that a state prisoner's right to federal habeas review of an adverse parole decision emanates

11   from clearly established U.S. Supreme Court precedent.  *See id.* at 561.  *See also Estelle*, 502

12   U.S. at 68 ("In conducting habeas review, a federal court is limited to deciding whether a

13   conviction violated the Constitution, laws, or treaties of the United States."); 28 U.S.C.

14   § 2241(c) ("The writ of habeas corpus shall not extend to a prisoner unless . . . [h]e is in

15   custody in violation of the [United States] Constitution or laws. . . .").  The governing law in

16   this context remains *Greenholtz* and *Allen*.  This Court assumes that the Ninth Circuit in

17   *Hayward* did not intend to overrule decades of U.S. Supreme Court precedent holding that a

18   federal liberty interest arises from a state statute that employs mandatory language creating a

19   presumption that parole release will be granted if certain designated findings are made.  As a

20   result, the undersigned follows the same reasoning as the concurrence, and finds that while

21   petitioner's liberty interest in parole originates from California law, its ultimate protection on

22

01  federal habeas review arises from the federal due process clause.  *See Hayward*, 603 F.3d at

02  569.

03          To provide a framework for analyzing whether "some evidence" supported the

04  Board's decision with respect to petitioner, this Court must consider the California statutes,

05  regulations and case law which govern decision-making by the Board.  *See Biggs v. Terhune*,

06  334 F.3d 910, 915 (9th Cir. 2003).  Under California law, the Board is authorized to set

07  release dates and grant parole for inmates with indeterminate sentences.  *See* Cal. Penal Code

08  § 3040 and 5075, *et seq*.  At the time of the 2007 hearing, § 3041(a) required the Board to

09  meet with each inmate one year before the expiration of his minimum sentence and normally

10  set a release date in a manner that will provide uniform terms for offenses of similar gravity

11  and magnitude with respect to their threat to the public, as well as comply with applicable

12  sentencing rules.  Subsection (b) of this section also requires that the Board set a release date

13  "unless it determines that the gravity of the current convicted offense or offenses, or the

14  timing and gravity of current or past convicted offense or offenses, is such that consideration

15  of the public safety requires a more lengthy period of incarceration for this individual, and

16  that a parole date, therefore, cannot be fixed at this meeting."  *Id.*, § 3041(b).  Pursuant to the

17  mandate of § 3041(a), the Board must "establish criteria for the setting of parole release

18  dates" which take into account the number of victims of the offense as well as other factors in

19  mitigation or aggravation of the crime.  The Board has therefore promulgated regulations

20  setting forth the guidelines it must follow when determining parole suitability.  *See* 15 CCR

21  § 2402, *et seq*.

22

01          Accordingly, the Board is guided by the following regulations in making a

02 determination whether a prisoner is suitable for parole:

> (a) General. The panel shall first determine whether the life
> prisoner is suitable for release on parole. Regardless of the
> length of time served, a life prisoner shall be found unsuitable
> for and denied parole if in the judgment of the panel the
> prisoner will pose an unreasonable risk of danger to society if
> released from prison.
>
> (b) Information Considered. All relevant, reliable information
> available to the panel shall be considered in determining
> suitability for parole. Such information shall include the
> circumstances of the prisoner's social history; past and present
> mental state; past criminal history, including involvement in
> other criminal misconduct which is reliably documented; the
> base and other commitment offenses, including behavior before,
> during and after the crime; past and present attitude toward the
> crime; any conditions of treatment or control, including the use
> of special conditions under which the prisoner may safely be
> released to the community; and any other information which
> bears on the prisoner's suitability for release. Circumstances
> which taken alone may not firmly establish unsuitability for
> parole may contribute to a pattern which results in a finding of
> unsuitability.

15 CCR § 2402(a) and (b).  Subsections (c) and (d) also set forth suitability and unsuitability

factors to further assist the Board in analyzing whether an inmate should be granted parole,

although "the importance attached to any circumstance or combination of circumstances in a

particular case is left to the judgment of the panel." 15 CCR § 2402(c).

          In examining its own statutory and regulatory framework, the California Supreme

Court in *Lawrence* held that the proper inquiry for a court reviewing a parole decision by the

Board is "whether some evidence supports the *decision* of the Board or the Governor that the

inmate constitutes a current threat to public safety, and not merely whether some evidence

confirms the existence of certain factual findings." *Lawrence*, 44 Cal.4th at 1212.  The court

01  also asserted that a parole decision must demonstrate "an individualized consideration" of the

02  specified criteria, but "[i]t is not the existence or nonexistence of suitability or unsuitability

03  factors that forms the crux of the parole decision; *the significant circumstance is how those*

04  *factors interrelate to support a conclusion of current dangerousness to the public*." *Id*. at

05  1204-05, 1212 (emphasis added).  Although the discretion of the Board in parole matters is

06  very broad, it must offer "more than rote recitation of the relevant factors with no reasoning

07  establishing a rational nexus between those factors and the necessary basis for the ultimate

08  decision – the determination of current dangerousness." *Id*.  Thus, the California penal code,

09  corresponding regulations, and decisional law clearly establish that the fundamental

10  consideration in parole decisions is public safety and an assessment of a prisoner's current

11  dangerousness.  *See id*. at 1205-06.

12      B.     *Summary of Governing Principles*

13          By virtue of California law, petitioner has a constitutional liberty interest in release on

14  parole.  The Board may decline to set a parole date only upon a finding that petitioner's

15  release would present an unreasonable current risk of danger to society if he is released from

16  prison.  Where the parole authorities deny release, based upon an adverse finding on that

17  issue, the role of a federal habeas court is narrowly limited.  *See Hayward*, 603 F.3d at 562-

18  63.  It must deny relief if there is "some evidence" in the record to support the parole

19  authority's finding of current dangerousness.  *See id*.  That is the determinative issue in this

20  case.

21

22

01        VI.     ANALYSIS OF THE RECORD IN THIS CASE

02        A.     *Due Process Clause Claim*

03        The Board based its decision that petitioner was unsuitable for parole primarily upon

04   his commitment offense, as well as petitioner's previous record of violence, unstable social

05   history, and inadequate parole plans.  (*See* Dkt. 1, Ex. A at 83-86.)  The Board's findings

06   track the applicable unsuitability and suitability factors listed in § 2402(b), (c) and (d) of title

07   15 of the California Code of Regulations.  After considering all relevant and reliable evidence

08   in the record, the Board concluded that evidence of petitioner's positive behavior in prison did

09   not outweigh evidence of his unsuitability for parole.  (*See id*. at 83.)

10        With regard to the circumstances of the commitment offense, the Board concluded that

11   the offense was carried out in "an especially cruel and callous manner," "a dispassionate

12   and/or calculated manner," and "in a manner which demonstrates an exceptionally callous

13   disregard for human suffering."  (*Id.* at 83-84.)  *See* 15 CCR § 2402(c)(1)(B) and (C).  The

14   Board found that "[t]he prisoner helped plan . . . an execution."  (Dkt. 1, Ex. A at 83.)  The

15   victim's bowels and guts were hanging out and [petitioner] aimed at the head but missed and

16   shot the victim [in the leg]."  (*Id*.)  *See* 15 CCR § 2402(c)(1)(B).  The Board observed that

17   "[t]his demonstrates a mindset that has no regard for human life at all."  (Dkt. 1, Ex. A at 84.)

18        The Board also concluded that "the motive for the crime was inexplicable or very

19   trivial.  It was for a debt of sixty dollars . . . There was some inkling that maybe it had more to

20   do with dope. . . ."  (*Id.*)  *See* 15 CCR § 2402(c)(1)(E).  In addition, during the hearing

21   petitioner admitted to the Board that he shot the victim because "I didn't want him to identify

22   us.  That was part of the reason." (Dkt. 1, Ex. A at 30.)  When the panel asked petitioner, who

01  has a background in the Marine Corps, if he meant to kill the victim when he shot him,

02  petitioner responded, "Yes.  You know, to finish the job."  (*Id*.)  Based upon the record before

03  this Court, the circumstances surrounding the commitment offense and the trivial motive for

04  the crime provide "some evidence" to support the Board's finding that petitioner carried out

05  his offense in an especially heinous, atrocious or cruel manner.  *See* 15 CCR § 2402(c)(1).

06      The second factor relied upon by the Board was petitioner's previous record of

07  violence.  *See* 15 CCR § 2402(c)(2) (providing that if a "prisoner on previous occasions

08  inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner

09  demonstrated serious assaultive behavior at an early age," this circumstance tends to indicate

10  unsuitability for parole).  Specifically, the Board found that "[petitioner] has a record of

11  assaultive behavior starting with his juvenile history at age seventeen.  [He] had sold the car

12  to an individual . . . and the person that allegedly was going to buy the car had someone else

13  in the room and a violent fight occurred."  (Dkt. 1, Ex. A at 85.)  During the hearing,

14  petitioner explained that "this incident happened right after my family had abandoned me . . .

15  And rather than leave and get people involved and handle it maturely, you know, and

16  responsibly, I let the situation escalate into a fight."  (*Id*. at 35.)  As a result of this incident,

17  petitioner served six months at a juvenile ranch facility in Utah.  (*See id*. at 84; *see id*. at 37.)

18  The Board observed that "[t]his type of behavior at age seventeen escalated, as you can see,

19  which is related to the prisoner's crime and his record . . . the violence escalated to a murder."

20  (*Id*.)  The Board's finding regarding petitioner's history of violence was supported by "some

21  evidence" in the record.

22

01    In addition, the Board found that "[t]he prisoner has an unstable social history" which

02 began at a very young age and contributed to his commission of the commitment offense.

03 (*Id*. at 85.)  *See* 15 CCR § 2402(c)(3) (providing that if a "prisoner has a history of unstable or

04 tumultuous relationships with others," this circumstance tends to indicate unsuitability for

05 release on parole).  Specifically, when the Board asked petitioner during the hearing "what

06 was going through [his] mind at the time" of the offense, petitioner responded that he had

07 agreed to help his co-defendant Sinaiko collect the $60 debt from the victim "in order to be

08 accepted and to be approved of" by Sinaiko.  (Dkt. 1, Ex. A at 20.)  By way of explanation, he

09 went on to describe his social history, which he claims "destroyed me emotionally."  (*Id*. at

10 18.)  Petitioner said, "there was (sic) several events in my life that led up to this crime . . . I

11 grew up in a family with a very abusive father, for one."  (*Id*. at 16-17.)  "When I was

12 seventeen my family abandoned me on the street."  (*Id*. at 17.)  When the Board asked

13 petitioner why he didn't turn himself in during the approximately five months between the

14 commitment offense and his arrest, petitioner responded, "Well, like, let me finish.  I was

15 leading up to the crime here . . . A year before the crime I had a divorce from my wife.  She

16 had left me for someone else, and that's when the [methamphetamine] use started, was about

17 a year before."  (*Id*. at 18.)  At the time of the murder, "I hadn't dealt with any of this, you

18 know, pain from my past . . . I was engaging in all these defense mechanisms and all the

19 repression. . . ."  (*Id*. at 19-20.)

20    Thus, petitioner asserted that he committed this offense in part to obtain social

21 acceptance from his co-defendants, which he desperately wanted as a result of his difficult

22 childhood, two failed marriages as an adult, and methamphetamine use.  (*Id*. at 20; *see id*. at

01   39.)  As a result of this discussion, the Board decided that petitioner's unstable social history

02   constituted a factor tending to indicate that he was unsuitable for parole.  (*See id*. at 85.)  This

03   Court finds that the Board's conclusion as to this factor was clearly supported by "some

04   evidence" in the record, such as petitioner's testimony regarding his "emotionally destructive"

05   social history at the hearing.

06          Finally, the Board considered petitioner's parole plans, and concluded that it "would

07   like to see [petitioner] perhaps get some more areas that you can live in as far as your living

08   situation. . . ."  (*Id*. at 86.)  Petitioner told the Board that if he was released on parole, his

09   "primary choice" was to live in a residence facility set up by the Calvary Chapel in Monterey,

10   California.  (*Id*. at 51.)  During the hearing, however, the Board elicited the fact that petitioner

11   had not actually been in direct contact with the pastor or any other person at the Calvary

12   Chapel.  (*Id*. at 53.)  Although petitioner asserted that he has "a job offer there in Monterey

13   through the pastor there . . . [at] a maintenance business," when the Board asked what

14   petitioner would be doing, he responded, "I think it's a – I think it's – I think he – I think it's a

15   tile-laying business."  (*Id*. at 54.)  Petitioner also admitted that he did not have any tile-laying

16   experience, "didn't know all of the details of the job," or possess much information about the

17   residence facility where he would be living.  (*Id*. at 53-54.)  For example, petitioner did not

18   know how much he would be paid for his work, or how long he could live at the residence

19   facility.  (*Id*. at 57.)  The Board observed that "it doesn't seem like there's a lot of information

20   that [petitioner has] explored with that."[5]  (*Id*. at 58.)

21   _____

22          [5] Although petitioner also briefly mentioned a Veterans Affairs facility in Menlo Park or a ministry in San Diego as possible residences, the discussion during the hearing focused on petitioner's "primary" parole plans in Monterey.  (*Id*. at 52-53.)

REPORT AND RECOMMENDATION - 18

01      As discussed above, the viability of a prisoner's parole plans is a statutory factor that

02 is relevant to a Board's suitability determination.  *See* 15 CCR § 2402(d)(8) (providing that if

03 a prisoner has an "understanding and plans for the future," including "realistic plans for

04 release or . . . marketable skills that can be put to use upon release," this circumstance tends to

05 indicate suitability for release on parole).  In addition, California courts have held that

06 inadequate parole plans may, in certain situations, provide "some evidence" that a prisoner

07 remains currently dangerous.  *See Lawrence*, 44 Cal.4th at 1228-29 (citing approvingly *In re*

08 *Honesto*, 130 Cal.App.4th 81, 97 (2005) (finding "some evidence" to support denial of parole

09 based upon prisoner's inadequate parole plans, unstable social history, and inadequate

10 participation in prison programs)).  In this case, it was unclear to the Board whether petitioner

11 would have the necessary skills for employment as a tile-layer, given his lack of experience in

12 this field.  Moreover, it was unclear whether petitioner's residential and employment plans at

13 the Calvary Chapel were indeed viable and realistic, in light of the fact that petitioner had

14 never made direct contact with anyone associated with the facility.  Based upon the record

15 before this Court, petitioner's parole plans appear uncertain, and therefore "some evidence"

16 supports the Board's finding regarding this factor.

17      During the hearing, the Board also considered and weighed the statutory factors which

18 favored petitioner.  For example, the panel acknowledged petitioner's positive psychological

19 reports, completion of welding and plumbing vocations, and noted that petitioner "stayed

20 busy during this last period with self-help [programming]."  (Dkt. 1, Ex. A at 42-50.)  *See*

21 *also* 15 CCR § 2402(d)(9) (providing that a prisoner's "institutional behavior indicat[ing] an

22 enhanced ability to function within the law upon release" constitutes a factor tending to

01   indicate suitability for parole).  The Board commended petitioner for never receiving a CDC

02   115 rules violation report, which documents a prisoner's misconduct "believed to be a

03   violation of law or . . . [otherwise] not minor in nature.  15 CCR § 3312(a)(3).  It also

04   commended petitioner for not receiving any CDC Form 128-A custodial counseling chronos

05   for over a decade.  (*See* Dkt. 1, Ex. A at 47.)  CDC 128-As are issued "[w]hen . . . minor

06   misconduct recurs after verbal counseling or if documentation of minor misconduct is

07   needed. . . ."  15 CCR § 3312(a)(2).  The Board advised petitioner to continue with his anger

08   management and education, because based upon his progress and good behavior in prison to

09   date, "the Panel feels that you certainly have a lot of potential."  (Dkt. 1, Ex. A at 86.)

10          Despite petitioner's positive gains, however, the Board found that petitioner would

11   present an unreasonable risk of danger to society if released on parole.  (*See* Dkt. 1, Ex. A at

12   83.)  The Board has broad discretion to determine how suitability and unsuitability factors

13   interrelate to support its conclusion of current dangerousness to the public.  *See also*

14   *Lawrence*, 44 Cal.4th at 1232.  The Board's findings with respect to petitioner's commitment

15   offense, previous record of violence, unstable social history, and inadequate parole plans were

16   amply supported by the record before this Court.  (*See* Dkt. 1, Ex. A at 83-86.)  As a result,

17   this Court agrees with the California state courts' finding, discussed below, that "some

18   evidence" supports the Board's conclusion that petitioner remains a current danger to public

19   safety.

20          B.      *California Court of Appeal's Decision Upholding the Board's Parole Denial*

21          The California Court of Appeal considered all of the above factors and evidence in the

22   record and "conclude[d] that 'some evidence' supports the board's decision to deny Schlappi

01  release on parole." (Dkt. 12, Ex. 5 at 5.)  Specifically, the California Court of Appeal asserted

02  that "the Board's ruling highlighted three general areas of concern . . . (i) the nature of

03  Schlappi's commitment offense; (ii) Schlappi's pre-incarceration criminal history; and (iii)

04  Schlappi's post-release plans."[6] (*Id*. at 6.)  The state court also found no merit in petitioner's

05  contention that the Board failed to allege any nexus between his offense and current

06  dangerousness.  The state court found, "it is clear from the record that the Board did not act in

07  the manner forbidden by *Lawrence* – relying reflexively on the aggravated nature of

08  Schlappi's commitment offense to deny parole.  Rather, the Board concluded that the nature

09  of Schlappi's commitment offense, along with other factors, indicated an unacceptable risk of

10  *current* dangerousness."  (*Id*. at 6.)  For example, the court asserted that petitioner's juvenile

11  offense, "like the commitment offense, indicated that Schlappi reacted to trivial, commonly

12  occurring events (this time a dispute over money owed for a used car) with unlawful

13  violence."  (*Id*. at 8.)  Similarly, the court noted that "the uncertainty of Schlappi's post-

14  release plans further supported a conclusion that Schlappi could easily fall into old patterns of

15  criminality and violence," because "there is a high likelihood that Schlappi, upon release, will

16  encounter circumstances analogous to those that led up to the commitment offense and thus,

17  that he could reoffend in a similar manner."  (*Id*. at 7-8.)

18      Finally, the California Court of Appeal observed that the Board's decision relied, at

19  least in part, upon immutable factors such as petitioner's commitment offense and pre-

20  incarceration history of violence.  The state court acknowledged that the Board cannot rely

21  upon immutable factors to deny petitioner a parole date in perpetuity, as over time "the

22      [6] As discussed *supra*, this Court finds that the Board's decision actually highlighted *four* general areas
of concern: the three factors identified by the California Court of Appeal, as well as petitioner's unstable social
history.  (*See* Dkt. 1, Ex. A at 85.)  *See also* 15 CCR § 2402(c)(1)-(3); *id*. § 2402(d)(8).

01   suitability factors undoubtedly will eclipse the immutable characteristics that formed the

02   primary (although not exclusive) basis for the Board's decision." (*Id*. at 10.)  When the

03   unsuitability factors identified by the Board in this case are "[t]aken together," however, the

04   state court nevertheless concluded that the "low threshold" of "some evidence" to support the

05   Board's decision was satisfied because the evidence of petitioner's suitability is not yet "so

06   'overwhelming' that we must reverse the Board's consideration as a violation of due process."

07   (*Id*. at 11.)

08        The record before this Court amply supports the California Court of Appeal's finding

09   that the "some evidence" standard was satisfied in this case.  For example, the Board accorded

10   petitioner individualized consideration with regard to all relevant statutory factors, including

11   petitioner's most current parole plans, and concluded that he remained a current danger to the

12   public.  Even though the Board found that petitioner's positive behavior in prison was

13   ultimately outweighed by other unsuitability factors, it duly considered his good behavior.

14   *See Shaputis*, 44 Cal.4th 1241, 1260 (holding that the Governor does not act arbitrarily or

15   capriciously in reversing a grant of parole when evidence in the record supports the

16   conclusion that the circumstances of the crime continue to be predictive of current

17   dangerousness despite a prisoner's discipline-free record during incarceration); *Lawrence*, 44

18   Cal.4th at 1228 (asserting that despite a prisoner's discipline-free record during incarceration,

19   where the record contains other evidence of unsuitability for parole, "the aggravated

20   circumstances of the crime reliably may continue to predict current dangerousness even after

21   many years of incarceration.").  Accordingly, I recommend the Court find that the California

22   Court of Appeal's decision upholding the Board's parole denial was a reasonable application

01  of clearly established federal law.

02       C.    *Petitioner's Claim That He Was Denied A "Fair and Impartial" Hearing*

03       During the 2007 parole hearing, the Board asked petitioner about a witness statement

04  from an Oceanside Police Report which the Board asserted was part of the non-confidential

05  section of petitioner's central file at the prison.  (*See* Dkt. 1, Ex. A at 68-75.)  Specifically, the

06  witness' statement suggested that petitioner had more of a leadership role in planning and

07  carrying out the commitment offense than petitioner had admitted to the panel during the

08  hearing.  (*See id*. at 70.)  When the panel asked petitioner whether he was acquainted with the

09  witness, who "seems to know a lot about [petitioner]," petitioner told the panel he had "never

10  heard of her."  (*Id*. at 73.)  Petitioner contends that the witness' statement regarding his role in

11  the offense should not have been considered at his hearing because it was unreliable, and "[i]t

12  is clear from the conduct of the hearing panel that their decision was predetermined . . . a clear

13  and deliberate violation of his Due Process rights guaranteed under the state and federal

14  Constitutions."[7] (Dkt. 1 at 6-8.)

15       In a footnote on the last page of its reasoned decision, the California Court of Appeal

16  rejected petitioner's argument that the Board erred by introducing this witness' statement

17  during the 2007 hearing.  Specifically, the California Court of Appeal observed that "[t]he

18  hearing transcript reflects that the commissioners asked Schlappi about this statement, but

19  there is no suggestion in the Board's ruling that it relied on it in denying him release."  (Dkt.

20  12, Ex. 5 at 11 n.8.)  Furthermore, the state court concluded that "[w]e can see nothing

21  improper in asking Schlappi about the statement," because the regulations provide that the

22  _____

         [7] As discussed *supra*, petitioner's state law claims are not cognizable in a federal habeas petition.  *See*
Estelle*, 502 U.S. at 67-68.

01  panel shall consider all relevant, reliable information in determining suitability for parole.

02  (*Id.*)

03      It is undisputed that under the Due Process Clause, prisoners are entitled to neutral

04  decision-makers in parole suitability hearings that are free from bias or prejudice.  *See*

05  *O'Bremski v. Maas*, 915 F.2d 418, 422 (9th Cir. 1990).  Specifically, parole board officials

06  must "render impartial decisions in cases and controversies . . . because the litigant's liberty is

07  at stake."  *Id.* (citing *Sellars v. Procunier*, 641 F.2d 1295, 1303 (9th Cir. 1981).  Furthermore,

08  the U.S. Supreme Court has stated that "[t]he parole determination . . . must include

09  consideration of what the entire record shows up to the time of the sentence, including the

10  gravity of the offense in the particular case."  *Greenholtz*, 442 U.S. at 15.

11      Based upon the record before this Court, there is no evidence to suggest, let alone

12  support a finding, that the panel during petitioner's 2007 parole hearing was biased, or the

13  outcome of the hearing was predetermined.  Given the fact that this inculpatory statement was

14  in the record, the Board acted fairly to petitioner by bringing it to his attention and offering

15  him a chance to comment upon it.  As noted, there is nothing in the decision to indicate that

16  the Board relied upon the witness' statement in any way.  In addition, petitioner has failed to

17  cite any authority to support his contention that by asking petitioner a question regarding a

18  witness' statement contained in his central file, the panel committed an error of state law that

19  violated petitioner's federal due process rights.  On the contrary, the record reveals that

20  petitioner received an individualized assessment of his suitability for parole during his 2007

21  parole hearing.

22

01     Without more, petitioner has failed to show that the Board's introduction of the

02   witness' statement regarding petitioner's role in the commitment offense resulted in a federal

03   constitutional violation.  Accordingly, I recommend the Court find that the California Court of

04   Appeal's decision denying petitioner's contention was a reasonable application of clearly

05   established federal law.

06        VII.   CERTIFICATE OF APPEALABILITY

07     The federal rules governing habeas cases brought by state prisoners were recently

08   amended to require a district court that denies a habeas petition to grant or deny a certificate

09   of appealability in the ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C.

10   § 2254 (effective December 1, 2009).  Previously, the Ninth Circuit held that a prisoner was

11   not required to obtain a certificate of appealability from administrative decisions, such as a

12   denial of parole.  *See White v. Lambert*, 370 F.3d 1002, 1010 (9th Cir. 2004); *Rosas v.*

13   *Nielsen*, 428 F.3d 1229, 1231-32 (9th Cir. 2005).

14     In *Hayward* the Ninth Circuit overruled "those portions of *White* and *Rosas* which

15   relieve a prisoner from obtaining a certificate of appealability."  *Hayward*, 603 F.3d at 554.  A

16   certificate of appealability is now required to "confer jurisdiction on [the Ninth Circuit] in an

17   appeal from a district court's denial of habeas relief in a § 2254 case, regardless of whether

18   the state decision to deny release from confinement is administrative or judicial."  *Id.*

19     In order to obtain a certificate of appealability, a petitioner must make "a substantial

20   showing of the denial of a constitutional right."  *See* 28 U.S.C. § 2253(c)(2).  Specifically, if a

21   court denies a petition, a certificate of appealability may only be issued "if jurists of reason

22   could disagree with the district court's resolution of his constitutional claims or that jurists

01  could conclude the issues presented are adequate to deserve encouragement to proceed

02  further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  *See also Slack v. McDaniel*, 529

03  U.S. 473, 484 (2000).  While the petitioner is not required to prove the merits of his case, he

04  must demonstrate "something more than the absence of frivolity or the existence of mere

05  good faith on his . . . part." *Miller-El*, 537 U.S. at 338.

06      For the reasons set forth in the discussion of the merits in my Report and

07  Recommendation, jurists of reason could not find the result recommended in this case

08  debatable.  Accordingly, I recommend that the Court deny petitioner a certificate of

09  appealability on the issue of whether the state courts' rejection of petitioner's claims was

10  contrary to, or involved an unreasonable application of, clearly established Federal law as

11  determined by the Supreme Court of the United States, or resulted in a decision that was

12  based on an unreasonable determination of the facts in light of the evidence presented.

13      VIII.   CONCLUSION

14      For the reasons stated above, this Court finds that as of the 2007 Board hearing there

15  was "some evidence" that petitioner would have posed an unreasonable risk of danger to

16  society or threat to public safety if released from prison.  In addition, petitioner has failed to

17  demonstrate that the Board denied petitioner a fair and impartial hearing under the Due

18  Process Clause by asking petitioner about a witness' statement to police regarding petitioner's

19  role in the commitment offense.  Accordingly, the California Court of Appeal's opinion

20  upholding the Board's decision was a reasonable application of clearly established federal

21  law.  I therefore recommend the Court: 1) find that petitioner's federal constitutional rights

22  were not violated; 2) deny the petition; 3) dismiss this action with prejudice; and 4) deny a

01  certificate of appealability.

02        This Report and Recommendation is submitted to the United States District Judge

03  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen (14)

04  days after being served with this Report and Recommendation, any party may file written

05  objections with this Court and serve a copy on all parties.  Such a document should be

06  captioned "Objections to Magistrate Judge's Report and Recommendation."  Any response to

07  the objections shall be filed and served within fourteen (14) days after service of the

08  objections.  The parties are advised that failure to file objections within the specified time

09  might waive the right to appeal this Court's Order.  *See Martinez v. Ylst*, 951 F.2d 1153 (9th

10  Cir. 1991).  A proposed order accompanies this Report and Recommendation.

11        DATED this 12th day of July, 2010.

12

13                                              _____

14                                              JOHN L. WEINBERG
                                                United States Magistrate Judge

15

16

17

18

19

20

21

22